JUDGE DAVID GUADERRAMA

FILED

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS** 2023 FEB 10  AM 10: 26
**EL PASO DIVISION**

CLERK. U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
                    DEPUTY

| | |
|---|---|
| **ERIK SALAIZ,** | § |
| | § |
| | § |
| **Plaintiff,** | § |
| | § |
| | § |
| **v.** | § |
| | § |
| **PROFITOPIA, LLC** an Arizona Limited Liability | § |
| Company and **KEVIN MARSHALL,** | § |
| | § |
| | § |
| **Defendants.** | § |
| | § |

**EP 23 CV 0057**

## PLAINTIFF'S ORIGINAL COMPLAINT

### PARTIES

1.      The Plaintiff is ERIK SALAIZ ("Plaintiff") a natural person, resident of the Western

District of Texas, and was present in Texas for all text messages, in this case in El Paso County,

Texas.

2.      Defendant PROFITOPIA, LLC ("Profitopia") is a limited liability company organized

and existing under the laws of Arizona and can be served via registered agent Kevin A. Marshall

at 3661 N Campbell Avenue, Ste 210, Tucson, Arizona 85719.

3.      Defendant KEVIN MARSHALL ("Marshall") is a natural person, resident of Arizona,

Chief Executive Officer of Defendant Profitopia, and can be served at 6324 N Calle De Ona,

Tucson, Arizona 85741.

4.      Defendants Profitopia and Marshall are hereinafter collectively referred to as

"Defendants."

### JURISDICTION AND VENUE

1

5.     Jurisdiction.  This Court has federal-question subject matter jurisdiction over Plaintiff's TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). This Court has supplemental subject matter jurisdiction over Plaintiff's claim arising under Texas Business and Commerce Code 305.053 because that claim arises from the same nucleus of operative fact, i.e., Defendants' tele market in robocalls to Plaintiff; adds little complexity to the case.

6.     Personal Jurisdiction.  This Court has general personal jurisdiction over the Defendants because they have repeatedly placed calls and text messages to Texas residents, derive revenue from Texas businesses, and they sell goods and services to Texas residents, including the Plaintiff.

7.     Venue.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to the claims—the calls and sale of goods and services directed at Texas residents, including the Plaintiff—occurred in this District and because the Plaintiff resides in this District.  Residing in the Western District of Texas when he received a substantial if not every single text message from Defendants are the subject matter of this lawsuit.

8.     This Court has venue over the Defendants because the text messages at issue were sent by the above-named Defendants to the Plaintiff, a Texas resident.

## THE TELEPHONE CONSUMER PROTECTION ACT
## OF 1991, 47 U.S.C. § 227

9.     In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing equipment that could target millions of consumers *en masse*.  Congress found that these calls were not only a nuisance and an invasion of privacy to consumers specifically but were also a

threat to interstate commerce generally. *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

10.     The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system ('ATDS") or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

11.     The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

12.     The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

13.     Separately, the TCPA bans telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

14.     The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

15.     According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

16.     The FCC also recognizes that "wireless customers are charged for incoming calls whether

---

[1] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

17.     The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines.  In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer:  (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

18.     *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

19.     The FCC confirmed this principle in 2013, when it explained that "a seller ... may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

20.     Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 – 52 (9th Cir. 2009).

21.     A corporate officer involved in the telemarketing at issue may be personally liable under

4

the TCPA. *E.g.*, *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at \*10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

## OVERVIEW OF THE TEXT MESSAGING MARKETING INDUSTRY

22.    In recent years, marketers who often have felt stymied by federal laws limiting solicitation by telephone, facsimile machine, and email have increasingly looked to alternative technologies through which to send bulk solicitations cheaply.

23.    One of the newest types of such marketing is to advertise through Short Message Services. The term "Short Message Service" or "SMS" describes a messaging system that allows cellular telephone subscribers to use their cellular telephones to send and receive short text messages, usually limited to 120-500 characters.

24.    An "SMS message" is a text directed to a wireless device. When an SMS message call is successfully made, the recipient's cell phone rings, alerting him or her that a call is being received.

25.    The open rate for SMS messages exceeds 99%, and 90% of those messages are read within three minutes. Conversely, the open rate for an email in the finance industry is 21.56%.

26.    Unlike more conventional advertisements, SMS calls, and particularly wireless or mobile spam can actually cost their recipients money, because cell phone users must frequently pay their respective wireless service providers either for each text message or call, they receive or incur a

usage allocation deduction to their text plan, regardless of whether or not the message is authorized.

27.     Most commercial SMS messages are sent from "short codes" (also known as "short numbers"), which are special cellular telephone exchanges, typically only five or six-digit extensions, that can be used to address SMS messages to mobile phones. Short codes are generally easier to remember and are utilized by consumers to subscribe to such services as television program voting or more benevolent uses, such as making charitable donations.

28.     A short code is sent to consumers along with the actual text message and conclusively reveals the originator of the SMS message.

29.     Text messages are "calls" within the context of the TCPA. *Satterfield v. Simon & Schuster, Inc.*, 569 F .3d 949 (9th Cir. 2009).

## FACTUAL ALLEGATIONS

30.     Plaintiff successfully registered his personal cell phone (XXX) XXX-1527 on the National Do-Not-Call Registry on April 6, 2022, which was more than 31 days prior to receiving the alleged text messages.

31.     Plaintiff never asked the National Do-Not-Call Registry administrator to remove him from the National Do-Not-Call Registry and Plaintiff was on the National Do-Not-Call Registry at all times relevant to this Complaint.

32.     Defendant Profitopia is a "national accounting firm" according to their website https://eradvisor.com.

33.     Defendant Profitopia is owned and controlled by Defendant Marshall.

34.     As part of marketing Defendant Profitopia's services, Defendant Marshall approves, ratifies, and authorizes text messages to be sent to consumers cell phones without prior express

written consent of the party receiving the text message.

35.     Plaintiff received at least eighteen (18) unauthorized text messages to his personal cell phone ending in 1527 from July 6, 2022, to November 16, 2022, from Defendant Profitopia soliciting employee retention credit ("ERC") assistance on behalf of Defendant Profitopia ("the text messages"). *See Exhibit A.*

36.     Defendant Profitopia is the originator of the text messages and sent the text messages to Plaintiff's personal cell phone ending in 1527 at the apparent authority and control of Defendant Marshall.

37.     Defendant Profitopia knew, or should have known, Plaintiff's phone number ending in 1527 was registered on the national do not call registry while they were sending Plaintiff the text messages, however refused to curtail their illegal behavior.

38.     Plaintiff has never been a customer or client of Defendants or has never had any business relationship with Defendants.

39.     Plaintiff did not give Defendants his prior express written consent to receive the text messages.

40.     Plaintiff did not have an established business relationship with Defendants prior to receiving the text messages.

41.     Plaintiff on multiple occasions attempted to identity who was sending him the text messages by replying to the text messages however was unsuccessful because Defendants failed to properly identify themselves.

42.     On November 10, 2022, Plaintiff clicked the link, erchelp.com, embedded in the text message received on November 10, 2022, in order to determine who was behind the illegal text messaging.

43.     The link erchelp.com redirects to https://ercadivsor.com.  The website

https://ercadvisor.com states "Profitopia's accountants are your ERC experts," and is own and

operated by Defendants Marshall and Profitopia, *See Exhibit B.*

44.     On November 16, 2022, Plaintiff received a text message from phone number 561-462-

8950 with the same erchlep.com link. See Exhibit A.

45.     Defendants sent Plaintiff the text messages in an attempt to gain Plaintiff as a client for

their financial gain.

46.     The text messages have caused Plaintiff actual harm. This includes the aggravation,

nuisance, and invasions of privacy that result from the placement of such text messages, in

addition, to wear and tear on his phone, phone freezing, interference with the use of his phone,

and consumption of battery life.

47.     The text messages Plaintiff received from Defendants do not address Plaintiff by name.

48.     Table below displays the text messages made to Plaintiff by Defendants:

| **Number** | **Date** | **Time** | **Caller ID** | **Notes** |
|---|---|---|---|---|
| **1.** | 07/06/2022 | 12:48 PM | 951-338-9880 | Text message |
| **2.** | 07/11/2022 | 9:42 AM | 951-338-9880 | Text message |
| **3.** | 07/16/2022 | 9:41 AM | 951-338-9880 | Text message |
| **4.** | 07/21/2022 | 9:40 AM | 951-338-9880 | Text message |

| 6. | 07/26/2022 | 10:01 AM | 951-338-9880 | Text message |
| 7. | 07/31/2022 | 9:39 AM | 951-338-9880 | Text message |
| 8. | 08/05/2022 | 9:39 AM | 951-338-9880 | Text message |
| 9. | 08/10/2022 | 9:40 AM | 951-338-9880 | Text message |
| 10. | 08/15/2022 | 9:39 AM | 951-338-9880 | Text message |
| 11. | 08/16/2022 | 11:16 AM | 951-338-9880 | Text message |
| 12. | 08/17/2022 | 11:42 AM | 951-338-9880 | Text message |
| 13. | 08/20/2022 | 9:39 AM | 951-338-9880 | Text message |
| 14. | 08/25/2022 | 9:39 AM | 951-338-9880 | Text message |
| 15. | 08/30/2022 | 9:39 AM | 951-338-9880 | Text message |
| 16. | 09/04/2022 | 9:38 AM | 951-338-9880 | Text message |
| 17. | 11/10/2022 | 11:03 AM | 951-338-9880 | Text message |

| **18.** | 11/16/2022 | 11:05 AM | 561-462-8950 | Text message |
|---------|------------|----------|--------------|--------------|

49.    The text messages Plaintiff received from Defendants were placed while knowingly ignoring the national do-not-call registry. The text messages were placed without training their agents/employees on the use of an internal do-not-call policy.

50.    On November 27, 2022, Plaintiff emailed an internal do-not-call policy request to Defendants to admin@profitopia.com which is an email address listed on their website they own and control https://profitopia.com.

51.    Defendants failed and/or refused to send Plaintiff a copy of any internal do not call policy.

52.    On information and belief, Defendants did not have a written do-not-call policy while they were sending Plaintiff text messages.

53.    No emergency necessitated none of the text messages.

54.    Plaintiff has limited data storage capacity on his cellular telephone. Incoming telemarketing text messages consumed part of this capacity.

## PERSONAL LIABILITY OF DEFENDANT MARHSALL

55.    Defendant Marshall refuses to take any action to stop or curtail unlawful sales practices and robocalling because these practices benefit Defendant Marshall financially.

"If the officer directly participated in or authorized the statutory violation, even though acting on behalf of the corporation, he may be personally liable.  See *United States v Pollution Serv. Of Oswego, Inc.*, 763 F.2d 133, 134-135 (2nd Cir.1985) The "well-settled" tort rule provides that "when corporate officers directly participate in or authorized the commission of a wrongful act, even if the act is done

on behalf of the corporation, they may be personally liable." *General Motors Acceptance Corp. v. Bates*, 954 F.2d 1081, 1085 (5th Cir. 1992). The Fifth Circuit has elaborated that "the thrust of the general [tort] rule is that the officer to be held personally liable must have some direct, personal participation in the tort, as where the defendant was the 'guiding spirit' behind the wrongful conduct....or the 'central figure' in the challenged corporate activity." *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cirt. 1985) (Citing *Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F. 2d 902, 907 (1st Cir.1980)) (Citing *Texas v. American Blastfax, Inc.*, 164 F. Supp. 2d 892 (W.D. Tex. 2001)

Quoting Texas v. American Blastfax:

The Court finds the above principles applicable to the TCPA that is, an officer may be personally liable under the TCPA if he had direct, personal participation in or personally authorized the conduct found to have violated the statute and was not merely tangentially involved. Individuals who directly (and here, knowingly and willfully) violate the TCPA should not escape liability solely because they are corporate officers. As the State persuasive argues, to hold otherwise would allow the individual defendants to simply dissolve Blastfax, set-up a new shell corporation, and repeat their conduct. Congress surely did not intend to permit such a result in passing the TCPA.

To be clear, the Court finds Greg and Michael Horne were the "guiding spirits" and the "central figures" behind the TCPA violations. They were the two persons who controlled all of Blastfax's day-to-day operations. They both had direct, personal involvement in and ultimate control over every aspect of Blastfax's wrongful conduct that violate the TCPA, and/or directly controlled and authorized this conduct. And they did so with their eyes and pocketbooks wide open. After October 5, 2000, Greg and Michael Horne had good reason to believe they were running a business that violated the TCPA. On February 9, 2001, they knew they were. Yet they continued to direct their company to send unsolicited intrastate fax advertisements. This is far more than a simple derivative liability case. Accordingly, the Court *899 holds defendants Greg and Michael Horne are jointly and severally liable with Defendant Blastfax, Inc., for all TCPA damages in this lawsuit." Texas v. American Blastfax, Inc., 164 F. Supp. 2d 892 (W.D. Tex. 2001)

56.     The Same Court held that corporate officers were also personally liable for DTPA violations;

> The State contends Greg and Michael Horne are personally liable for any DTPA damages because they were solely responsible for the violating conduct…..For the same reasons discussed in finding the individual defendants personally liable under the TCPA, the Court agrees.  See, e.g., *Barclay v. Johnson*, 686 S.W.2d 334, 336-37 (Tex. Civ. App.-Houston [1ST Dist.] 1985, no writ) (finding personal liability for corporate officer in DTPA misrepresentation claim, based on general rule that "a corporate agent knowingly participating in a tortious of fraudulent act may be held individually liable, even though he performed the act as an agent for the corporation……Accordingly, the Court finds defendants American Blastfax, Inc., Greg Horne and Michael Horne are jointly and severally liable for $6,000 in damages for their violations of the DTPA." *Texas v. American Blastfax, Inc.*, 164 F. Supp. 2d 892 (W.D. Tex. 2001).

57.     At all times material to the Complaint, acting alone or in concert with others, Defendant Marshall has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Defendant Profitopia including the acts or practices set forth in this Complaint.

58.     Defendant Marshall is the manager and owner of Defendant Profitopia and controls the day-to-day operations of Profitopia and directed their employees, agents, salespersons, and solicitors to make TCPA violating text messages and to solicit their accounting services.

59.     Defendant Marshall approved and directed the illegal text messages to be made for his financial benefit.

60.     Defendant Marshall is not merely a bystander.  He is the mastermind that schemed, planned, directed, initiated, and controlled illegal and fraudulent behavior.

61.     Defendant Marshall is well aware his conduct violated the TCPA and Tex. DPTA and refused to alter their behavior.  Defendant Marshall is the sole director Marshall and the only

person with the power to make the unlawful, fraudulent, and unethical behavior stop. Yet,

Marshall has taken no steps to stop the behavior because the behavior benefits Marshall

financially. Defendant Marshall breaks the law with his eyes and pocketbooks wide open.

62.     Defendants should be held jointly and severally liable for the TCPA violations because

they actually committed the conduct that violated the TCPA, and/or he actively oversaw and

directed this conduct.

63.     Defendant Marshall should be held liable because to do otherwise would simply allow

him to dissolve Profitopia and set up a new corporation and repeat their conduct. This would

result in the TCPA being unenforceable.

## INJURY, HARM, DAMAGES, and ACTUAL DAMAGES
## AS A RESULT OF THE CALLS

64.     Defendants' text messages harmed Plaintiff by causing the very harm that Congress

sought to prevent—a "nuisance and invasion of privacy."

65.     Defendants' text messages harmed Plaintiff by trespassing upon and interfering with

Plaintiff's rights and interests in Plaintiff's cellular telephone.

66.     Defendants' text messages harmed Plaintiff by intruding upon Plaintiff's seclusion.

67.     Plaintiff has been harmed, injured, and damaged by the text messages including, but not

limited to: reduced device storage, reduced data plan usage, anger, frustration, invasion of

privacy, and more frequent charging of his cell phone.

### Plaintiff's cell phone is a residential number

68.     The text messages were to Plaintiff's cellular phone ending in 1527 which is Plaintiff's

personal cell phone that he uses for personal, family, and household use. Plaintiff also uses his

cell phone for navigation purposes, sending and receiving emails, timing food when cooking, and

sending and receiving text messages. Plaintiff further has his cell phone registered in his personal name, pays the cell phone from his personal accounts, and the phone is not primarily used for any business purpose.

### Violations of the Texas Business and Commerce Code 305.053

69.     The actions of the Defendants violated the Texas Business and Commerce Code 305.053 by placing text messages to a cell phone which violates 47 USC 227(b). The text messages by Defendants violated Texas law by placing text messages to a cell phone which violates 47 USC 227(c)(5) and 47 USC 227(d) and 47 USC 227(d)(3) and 47 USC 227(e).

70.     The text messages by Defendants violated Texas law by spoofing the caller IDs per 47 USC 227(e) which in turn violates the Texas statute.

### COUNT ONE:

### (Violation of the TCPA "Sales Call/DNC" Prohibition, 47 U.S.C. 227(c), and 47 C.F.R. § 64.1200(C))

### (Against All Defendants)

71.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

72.     The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute a violation of FCC regulations by making multiple telemarketing solicitations to a consumer on the National Do-Not-Call Registry within a 12-month period in violation of 47 C.F.R. § 64.1200(c)(2).

73.     Defendants sent text messages to Plaintiff's private residential telephone number which was successfully registered on the National Do-Not-Call Registry more than thirty-one (31) days

prior to the text messages, in violation of 47 U.S.C § 227(c)(3)(F), and 47 C.F.R. § 64.1200(c)(2).

74.     Plaintiff was statutorily damaged at least eighteen (18) times under 47 U.S.C. § 227(c)(3)(F) by Defendants by the text messages described above, in the amount of $500 per text message.

75.     Plaintiff is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

76.     Plaintiff is entitled to an award up to $1,500 in damages for each knowing or willful violation of 47 U.S.C. § 227(c)(3)(F).

## **COUNT TWO:**

### **Telemarketing Without Mandated Safeguards, 47 C.F.R. § 64.1200(d)**

### **(Against All Defendants)**

77.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

78.     The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of FCC regulations by making telemarketing solicitations despite lacking the following:

> a.  A written policy, available upon demand, for maintaining a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(1)[2];
>
> b.  Training for the individuals involved in the telemarketing on the existence of and use of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2)[3]; and,

---

[2] *See id.* at 425 (codifying a June 26, 2003 FCC order).
[3] *See id.* at 425 (codifying a June 26, 2003 FCC order).

    c.   In the solicitations, the name of the individual caller and the name of the person or entity on whose behalf the call is being made, in violation of 47 C.F.R. § 64.1200(d)(4).[4]

79.    Plaintiff is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

80.    Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(c)(5).

## COUNT THREE

### Violations of The Texas Business and Commerce Code 305.053

### (Against All Defendants)

81.    Plaintiff incorporates the foregoing allegations as if set forth herein.

82.    The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of the **Texas Business and Commerce Code 305.053**, by making non-emergency telemarketing text messages to Mr. Salaiz cellular telephone number without his prior express written consent in violation of 47 USC 227 et seq. The Defendants violated 47 USC 227(d) and 47 USC 227(d)(3) and 47 USC 227(e).

83.    Plaintiff is entitled to an award of at least $500 in damages for each such violation. **Texas Business and Commerce Code 305.053(b)**

84.    Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. **Texas Business and Commerce Code 305.053**(c)

---

[4] *See id.* at 425 (codifying a June 26, 2003 FCC order

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Erik Salaiz prays for judgment against the Defendants jointly and severally as follows:

A.     Leave to amend this Complaint to name additional DOESs as they are identified and to conform to the evidence presented at trial;

B.     A declaration that actions complained of herein by Defendants violates the TCPA and Texas state law;

C.     An injunction enjoining Defendants and their affiliates and agents from engaging in the unlawful conduct set forth herein;

D.     An award of $1500 per text message in statutory damages arising from the TCPA §227(c) intentional violations jointly and severally against the corporation and individual for eighteen text messages.

E.     An award of $1,500 in statutory damages arising from violations of the Texas Business and Commerce code 305.053 intentional violations jointly and severally against the corporation and individual for eighteen text messages.

F.     An award to Mr. Salaiz of damages, as allowed by law under the TCPA and Texas state law;

G.     An award to Mr. Salaiz of interest, costs, and attorneys' fees, as allowed by law and equity

H.     Such further relief as the Court deems necessary, just, and proper.

February 10, 2023,                              Respectfully submitted,

17

Erik Salaiz
Plaintiff, Pro Se
319 Valley Fair Way
El Paso, Texas 79907
915-929-1527
Salaiz.ep@gmail.com

2:27

+1 951-338-9880
12:48 PM, Jul 6

Hi there.  Just a friendly reminder, there are still Covid related government subsidies for businesses like yours.  We specialize in getting you whatever dollars your business is eligible for.  There are tons of state and federal programs that have yet to be exhausted.  If you'd like our assistance in applying reply "YES"

Copy text          Share          More

**Exhibit A**

2:27

+1 951-338-9880 ⌄

Wednesday, July 6

Hi there.  Just a friendly reminder, there are still Covid related government subsidies for businesses like yours. We specialize in getting you whatever dollars your business is eligible for.  There are tons of state and federal programs that have yet to be exhausted.  If you'd like our assistance

**View all**                                →

12:48 PM

Monday, July 11

Hi there.  Just a friendly reminder, there are still Covid related government subsidies for businesses like yours. We specialize in getting you whatever dollars your business is eligible for.  There are tons of state and federal programs that have yet to be exhausted.  If you'd like our assistance

**View all**                                →

9:42 AM

Saturday, July 16

Hi there.  Just a friendly reminder, there are still Covid related government subsidies for businesses like yours. We specialize in getting you whatever dollars your business is eligible for.  There are tons of state and federal programs that have yet to be

Exhibit A

2:28

+1 951-338-9880 ⌄

Thursday, July 21

Hi there. Just a friendly reminder, there are still Covid related government subsidies for businesses like yours. We specialize in getting you whatever dollars your business is eligible for. There are tons of state and federal programs that have yet to be exhausted. If you'd like our assistance

**View all** ⟩

9:40 AM

11:58 AM   YES

Friday, July 22

Great! On average, what is the business monthly revenue? How many W2 employees do you have? And what is your approx credit score?   7:13 AM

Saturday, July 23

$70,000
5
720

5:02 PM

Tuesday, July 26

Okay I can definitely show you a few programs. What is the best email to

**Exhibit A**

2:28 ☑

📷 ⚙ 📶 77% 🔋

‹   +1 951-338-9880 ⌄          ⋮

Tuesday, July 26

Okay I can definitely show you a few
programs. What is the best email to
send the application and information
to? Also, when are you free for a call?          9:21 AM

Hi there.  Just a friendly reminder, there
are still Covid related government
subsidies for businesses like yours.
We specialize in getting you whatever
dollars your business is eligible
for.  There are tons of state and
federal programs that have yet to be
exhausted.  If you'd like our assistance

**View all**                              ›          10:01 AM

Sunday, July 31

Hi there.  Just a friendly reminder, there
are still Covid related government
subsidies for businesses like yours.
We specialize in getting you whatever
dollars your business is eligible
for.  There are tons of state and
federal programs that have yet to be
exhausted.  If you'd like our assistance

**View all**                              ›          9:39 AM

Friday, August 5
                                           ⌄

Hi there.  Just a friendly reminder, there

🖼   📷   ➕   |                    🙂   〰

|||        ▢        ‹

Exhibit A

2:29

< +1 951-338-9880 ⌄

Sunday, July 31

Hi there. Just a friendly reminder, there are still Covid related government subsidies for businesses like yours. We specialize in getting you whatever dollars your business is eligible for. There are tons of state and federal programs that have yet to be exhausted. If you'd like our assistance

**View all** >

9:39 AM

Friday, August 5

Hi there. Just a friendly reminder, there are still Covid related government subsidies for businesses like yours. We specialize in getting you whatever dollars your business is eligible for. There are tons of state and federal programs that have yet to be exhausted. If you'd like our assistance

**View all** >

9:39 AM

Monday, August 8

What is your website

12:30 PM

Wednesday, August 10

Hi there. Just a friendly reminder, there are still Covid related government

Exhibit A

2:29

+1 951-338-9880 ⌄

Wednesday, August 10

Hi there.  Just a friendly reminder, there are still Covid related government subsidies for businesses like yours.  We specialize in getting you whatever dollars your business is eligible for.  There are tons of state and federal programs that have yet to be exhausted.  If you'd like our assistance

**View all**                              ❯

9:40 AM

What business is this

10:01 AM

Monday, August 15

Hi there.  Just a friendly reminder, there are still Covid related government subsidies for businesses like yours.  We specialize in getting you whatever dollars your business is eligible for.  There are tons of state and federal programs that have yet to be exhausted.  If you'd like our assistance

**View all**                              ❯

9:39 AM

Tuesday, August 16

REMINDER!  Time is running out to claim your ERTC refund.  The ERTC is a REFUND from the IRS for up to $26k per W2 employee you had in 2020/2021...

Exhibit A

2:29

77%

‹   +1 951-338-9880 ⌄          ⋮

Tuesday, August 16

REMINDER!  Time is running out to
claim your ERTC refund.  The ERTC
is a REFUND from the IRS for up to
$26k per W2 employee you had in
2020/2021...
How many W2's did you have then?          11:16 AM

Wednesday, August 17

REMINDER!  Time is running your to
claim your ERTC refund.  The ERTC
is a REFUND from the IRS for up to
$26k per W2 employee you had in
2020/2021...
How many W2's did you have then?          11:42 AM

Saturday, August 20

Hi there.  Just a friendly reminder, there
are still Covid related government
subsidies for businesses like yours.
We specialize in getting you whatever
dollars your business is eligible
for.  There are tons of state and
federal programs that have yet to be
exhausted.  If you'd like our assistance

**View all**                              ›          9:39 AM

Monday, August 22

8:55 AM 

Exhibit A



**Exhibit A**



2:30

+1 951-338-9880 ⌄

We specialize in getting you whatever dollars your business is eligible for. There are tons of state and federal programs that have yet to be exhausted. If you'd like our assistance

**View all** 〉

9:39 AM

10:17 AM    Yes

Sunday, September 4

Hi there. Just a friendly reminder, there are still Covid related government subsidies for businesses like yours. We specialize in getting you whatever dollars your business is eligible for. There are tons of state and federal programs that have yet to be exhausted. If you'd like our assistance

**View all** 〉

9:38 AM

Thursday, November 10

Good Morning, this is Josh Lebowitz from ERCHELP.COM. Reminder that your business is eligible for up to $26k per W2 employee on payroll in 2020-2021. We are a team of tax attorneys that focus on getting you the stimulus YOUR BUSINESS DESERVES! If you'd like our assistance reply "YES"

11:03 AM

Exhibit A

6:06

< **+1 561-462-8950**
11:05 AM, Nov 16

Hey there!  This is Josh Lebowitz from
**ERCHELP.COM**.  Was your business affected by
government mandates or supply chain issues? If
so, you're eligible for up to $26k per W2 employee
under the CARES act.  This is a REFUND, NOT
A LOAN.  We are a team of tax attorney's that
specialize in maximizing this credit for you.  If
you'd like our assistance reply "YES". Reply STOP
to unsubscribe.



Copy text          Share          More

Exhibit A

# Questions about Employee Retention Credit?

## Had trouble getting through to the IRS for answers?

## We are your ERC Experts and are ready to help! 1-888-778-6742?

This unprecedented legislation is very complicated and requires the help of seasoned tax professionals. We are working around the clock to help struggling small businesses to maximize the amazing benefits now available to them.

Basically, ERC rewards businesses for retaining employees during the first half of 2021.

✓ **Tax credit payments**
up to 70% of an employee's salary or up to $14,000 per employee

✓ **NO repayment requirement**
and NO applications (unlike for PPP funds)

✓ **Employers must demonstrate**
at least 20% decline in 2021 gross receipts vs. 2019

✓ **Company or organization**



Exhibit B

must employ fewer than 500 people

LEARN MORE



# *Few small business owners are aware of the ERC program – and even fewer know how to reap its limited-time financial benefits.*

## *Profitopia accountants analyze a **business's eligibility** and calculate cash refunds.*

The calculations for qualifying and determining employee retention credits are complicated. To help small businesses navigate the complex ERC provisions, **Profitopia**, a national accounting firm, is providing **FREE consultations** to companies and organizations. If a business elects to retain Profitopia to file their Employee Retention Credit tax statement, **Profitopia's** accounting fee is not due until the business receives their money from the U.S. government.



Exhibit B

## *Don't wait to sign up:*

**Profitopia's accountants are Your ERC Experts.**
They are trained in all specifics of this unprecedented legislation – and
can get your ERC tax credits to you fast.
**No risk. No wait. No problem.**



## PROFITOPIA®

www.Profitopia.com

**For your free consultation,**
Contact Your ERC Experts now.

Sean Smiley

 888-778-6742

 ssmiley@profitopia.com



Exhibit B